*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re TAYLOR, Minors.

UNPUBLISHED
May 30, 2024

No. 366676
Wayne Circuit Court
Family Division
LC No. 2018-002014-NA

In re L. R. TAYLOR, Minor.

No. 366677
Wayne Circuit Court
Family Division
LC No. 2022-001876-NA

Before: FEENEY, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-father appeals as of right the trial court's orders terminating his parental rights to the minor children, ALT, LAT, and LRT, pursuant to MCL 712A.19b(3)(b)(*i*) (child or sibling of a child suffered physical injury or abuse), (j) (reasonable likelihood of harm if returned to parent), and (k)(*iii*) (parent battered, tortured, or otherwise severely physically abused child or sibling). We affirm.

## I. FACTUAL BACKGROUND

Respondent-father is the biological father of ALT, LAT, and LRT. AMF is the respondent-mother of ALT and LAT. Mother has three living children—AFS, CAS, JJA—and one deceased child, CXA. ALT and LAT were in mother's care prior to the initiation of the case, whereas LRT

---

[1] *In re Taylor Minors*, unpublished order of the Court of Appeals, entered July 5, 2023 (Docket Nos. 366676 and 366677).

was in a long-term placement with her mother (BNB), who was not named as a respondent in the proceedings below. ALT and LAT were removed from mother's care and placed with their paternal grandmother following the authorization of the petition in this case. The trial court terminated mother's parental rights to all of her children when it terminated father's parental rights to each of his children.[2]

Petitioner, the Department of Health and Human Services (DHHS), filed a petition on July 11, 2022, requesting that the trial court terminate father's parental rights to ALT and LAT. According to the petition, police officers came to mother's home to perform a wellness check on CXA in June 2022 and discovered that he died in March 2022. CXA's body was found in a freezer in the basement. The basement freezer was not working when the police found CXA's body, and the rear part of the house smelled like rotting meat. Mother stated that she kicked CXA in the chest the day before she discovered that he was dead. The petition requested that the trial court terminate father's parental rights under MCL 712A.19b(3)(b)(*i*), (j), and (k)(*iii*) because father should have known that mother's home was unfit, yet he failed to protect ALT and LAT by removing them, did not provide financial support for any of his children, and physically abused CXA prior to his death.

CXA's autopsy report revealed that he was three years old when he died, suffered from blindness, and was malnourished. When he died, he had multiple healed fractures and bleeding in his brain. CXA's death was ruled a homicide caused by blunt force trauma to the head. After the autopsy report was released, CAS participated in a forensic Kids-TALK interview where he revealed that father severely physically abused him, CXA, and JJA. After the interview, DHHS amended its original petition to add new allegations based on the autopsy report and CAS's interview statements. DHHS also filed a second petition seeking termination of father's parental rights to LRT for the same reasons it sought termination of his parental rights to ALT and LAT in the amended petition.

DHHS filed two motions pursuant to MCR 3.972(C)(2), seeking to admit statements that AFS and CAS made during their Kids-TALK interviews, and requested a tender-years hearing to determine the admissibility of the statements. The tender-years hearing was held before the termination hearing began. During the hearing, father specifically challenged the admission of CAS's Kids-TALK interview. The trial court found that even though CAS was young, he understood the difference between the truth and a lie, and understood how to respond when he did not know the answer. The trial court acknowledged that CAS's statements were not perfectly consistent, but held that the statements were admissible as substantive evidence because the circumstances surrounding the giving of the statements provided adequate indicia of trustworthiness. The court thereafter admitted CAS's interview statements.

The termination hearing followed. The trial court ultimately found statutory grounds for termination of father's parental rights under MCL 712A.19b(3)(b)(*i*), (j), and (k)(*iii*) because father left ALT and LAT in a home he knew was unfit, failed to call the police or contact Children's

---

[2] Though mother was also a respondent in this case, she does not participate in this appeal. All references to mother in the record will be omitted unless relevant to father's appeal.

Protective Services (CPS) regarding the condition of mother's home, and physically abused CXA. The trial court found that termination was in the children's best interests because father likely knew CXA was dead and yet aided in the concealment of his death. The court further found that father only visited his children because the trial court ordered him to, left ALT and LAT with mother, who had severe mental health issues, and allowed the children to stay in a home that was in a deplorable condition. The court also noted that father did not pay child support and did not have a significant bond with his children. An order terminating father's parental rights was subsequently entered. This appeal followed.

## II. ANALYSIS

### A. ADMISSIBILITY OF EVIDENCE

Father first argues that the trial court abused its discretion by admitting CAS's Kids-TALK interview statements because they lacked adequate indicia of trustworthiness. We disagree.

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 629; 853 NW2d 459 (2014) (citation omitted).

The rules of evidence for a civil proceeding generally apply to termination proceedings. See MCR 3.972(C)(1); *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014). In those proceedings, statements made by young children discussing acts of child abuse are admissible, even if they are hearsay, provided that certain criteria are satisfied. See MCR 3.972(C)(2); see also *In re Archer*, 277 Mich App 71, 80; 744 NW2d 1 (2007). MCR 3.972(C)(2) provides, in relevant part:

> Any statement made by a child under 10 years of age . . . regarding an act of child abuse, child neglect, confirmed sexual abuse, or confirmed sexual exploitation, as defined in MCL 722.622(g), (k), (q), or (r), performed with or on the child by another person may be admitted into evidence through the testimony of a person who heard the child make the statement as provided in this subrule.
>
> (a) A statement describing such conduct may be admitted regardless of whether the child is available to testify or not, and is substantive evidence of the act or omission if the court has found, in a hearing held before trial, that the circumstances surrounding the giving of the statement provide adequate indicia of trustworthiness. This statement may be received by the court in lieu of or in addition to the child's testimony.
>
> (b) If the child has testified, a statement denying such conduct may be used for impeachment purposes as permitted by the rules of evidence.
>
> (c) If the child has not testified, a statement denying such conduct may be admitted to impeach a statement admitted under subrule (2)(a) if the court has

found, in a hearing held before trial, that the circumstances surrounding the giving of the statement denying the conduct provide adequate indicia of trustworthiness.

Thus, under MCR 3.972(C)(2)(a), the court must determine, "in a hearing held before trial," whether the statement possesses adequate indicia of trustworthiness. "The reliability of a statement depends on the totality of the circumstances surrounding the making of the statement." *In re Archer*, 277 Mich App at 82. Circumstances indicating the reliability of a hearsay statement may include spontaneity, consistent repetition, the mental state of the declarant, use of terminology unexpected of a child of a similar age, and lack of motive to fabricate. *Id.*

After reviewing the lower court record and a recording of the Kids-TALK interview, we conclude that adequate indicia of trustworthiness supported the admission of the statements made by seven-year-old CAS. We note that the trial court properly followed the procedure for admitting the contested statements by holding a tender-years hearing to review the evidence. During the hearing, the trial court heard testimony from Stephanie Green, the Kids-TALK interviewer who conducted CAS's September 2022 interview. Green attested that she received training in conducting interviews of abused children, had conducted nearly 1,400 such interviews, and followed Michigan's interviewing protocol in conducting CAS's interview. See *id.* (explaining that the use of an experienced forensic interviewer who followed the state's interviewing protocol weighs favorably in determining that statements made during a child's interview are trustworthy). Green testified that CAS understood the difference between a lie and the truth, and knew he could ask for clarification if he did not understand a question. See *Brown*, 305 Mich App at 634 (holding that a child's ability to discern between a truth and a lie weighs in support of finding their statements trustworthy). The trial court agreed and found that CAS also understood how to respond when he did not know the answer. While a few of CAS's statements were not consistent, CAS was able to give specific details in his testimony. For example, CAS accurately identified and gave specific responses about the color of the bag in which mother put CXA's body, indicating that his statements were predominantly reliable. CAS was six years old when the events he spoke about occurred, indicating that he was old enough to have a memory of the major events, but young enough that he may have conflated minor details from different incidents, making his testimony appear inconsistent at times. Importantly, CAS never contradicted his statements about father's abuse.

Nothing in CAS's statements indicated that someone coached him to incriminate father. CAS stated that mother put CXA in the freezer, and that she told the children not to tell father. If CAS had been coached to incriminate father, as father claims, there would be no reason for CAS to exculpate father in relation to CXA's death by stating that father did not know CXA was dead. CAS stated that no one told him what to say, and he used a vocabulary that was appropriate for his age, demonstrating that he was not reiterating words used by an adult in an attempt to coach him on how to respond. See *Archer*, 277 Mich App at 82 (explaining that a child's choice of vocabulary is relevant in determining whether their statements are trustworthy). Specifically, CAS used phrases like "use the bathroom on the floor," "whoopings," and "doo doo," which revealed that he was likely using his own terminology, not someone else's. CAS appeared comfortable answering Green's questions, and did not take long to answer her, indicating that he was not nervous about lying or stalling in order to think up a false answer.

Father challenges the spontaneity of CAS's statements, alleging he did not make the incriminating disclosures about father when a CPS investigator spoke with him on the day that CXA's body was discovered. However, CAS did disclose to the investigator that father abused CXA. Accordingly, this argument is meritless. Father also alleges that CAS changed his testimony because he was personally motivated to help mother. Again, that theory is inconsistent with CAS's interview statements. If CAS was lying to help mother, it seems likely that he would have stated that father was at least involved in CXA's murder and the placement of his body in the freezer, instead of indicating that father was unaware of CXA's death. Further, CAS's statements about father's abuse were consistent with AFS's statement that father was physically abusive toward mother and CXA, as well as CXA's autopsy report, which indicated that he had multiple healed fractures and bleeding in his brain when he died. See *Brown*, 305 Mich App at 634 (holding that corroboration between statements from multiple people indicate that the corroborated information is trustworthy). The corroboration indicates CAS's statements were not fabricated. Finally, father argues that the poor audio quality of the Kids-TALK video weighed against admitting the statements. However, the trial court only admitted the statements that Green could discern and testify concerning, thereby resolving that issue. In light of the totality of the circumstances, sufficient indicia of trustworthiness existed to support the admission of CAS's Kids-TALK statements. Accordingly, father's claim must fail.

## B. STATUTORY GROUNDS

Father next argues that the trial court clearly erred by finding statutory grounds to terminate his parental rights under MCL 712A.19b(3)(b)(*i*), (j), and (k)(*iii*). We disagree.

"We review for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence. A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Richardson*, 329 Mich App 232, 251; 961 NW2d 499 (2019) (citation omitted).

Under MCL 712A.19b(3)(b)(*i*), a court may terminate parental rights if it finds clear and convincing evidence that a child or sibling of the child has suffered physical abuse from the parent and there is a "reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." A respondent's abuse of a half-sibling is sufficient to satisfy the requirements in MCL 712A.19b(3)(b)(*i*). *In re Hudson*, 294 Mich App 261, 266; 817 NW2d 115 (2011).

In her Kids-TALK interview, AFS stated that father physically abused CXA—a blind, malnourished three-year-old—and whipped him with a belt. The trial court found this testimony credible, and we conclude that it sufficiently demonstrates that the trial court did not clearly err by concluding that father physically abused CXA. See *In re Schadler*, 315 Mich App 406, 409; 890 NW2d 676 (2016) ("It is not for this Court to displace the trial court's credibility determination.") (citation omitted). Furthermore, CAS stated in his Kids-TALK interview that father abused him and CXA. When asked about CXA, CAS stated that father beat CXA with a belt buckle, hit him with a comb, threw him on the ground, and hit him on the face. Regarding his own abuse, CAS testified that father kicked and stomped on his face, punched him in the stomach, and stomped on his foot, causing it to break. CAS stated that father also beat JJA with a belt. These statements

-5-

clearly demonstrated that father physically abused the children. Further, the statements were corroborated by CXA's autopsy report, which revealed that he had multiple healed fractures and bleeding in his brain, and that he died from blunt force trauma to the head. Accordingly, the trial court did not clearly err by finding that father physically abused at least one of his children's half siblings.

With respect to MCL 712A.19b(3)(j), we conclude that the trial court did not clearly err by finding there was a reasonable likelihood that the children would suffer injury or abuse if returned to father. Father abused CXA, CAS, and JJA. Evidence that a parent harmed a child in the past suggests there is a reasonable likelihood of future harm. *In re Mason*, 486 Mich 142, 165; 782 NW2d 747 (2010). Additionally, although the evidence did not indicate that father harmed his own biological children, his abuse of his children's half-siblings was probative of how he would likely treat his own children. See *In re Mota*, 334 Mich App 300, 323; 964 NW2d 881 (2020) (explaining that a parent's treatment of a nonrelative child is probative of how they may treat their children). There was also evidence that father abused CXA because he did not like CXA, and expressly told CXA that he did not like him. Father's emotional abuse of CXA also weighed in support of the trial court's finding. See *In re Sanborn*, 337 Mich App 252, 279; 976 NW2d 44 (2021) (explaining that the harm contemplated under MCL 712A.19b(3)(j) includes emotional harm).

Additionally, father demonstrated a total lack of concern for ALT's and LAT's well-being. Father left ALT and LAT with mother in a dirty, unfit home, where at least one of the children was visibly malnourished. Father admitted that he did not remove the children from mother's home despite knowing the home was unfit. This negligent behavior put the children at risk of harm and supported the trial court's finding that the children would likely be harmed if returned to father's care. See *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (exhibiting behavior that would put the child at a risk of harm demonstrates that there is a reasonable likelihood that a child would be harmed if left in that parent's care).

The record also indicates that father told mother not to take CXA to the hospital on two occasions when he needed medical care, thereby depriving CXA of necessary medical care. One of the incidents appears to have occurred after CXA sustained the injuries that ultimately caused his death. This behavior raises serious concerns about how father would care for the children if they were placed with him, and if he would also deny them necessary medical treatment. See *Mota*, 334 Mich App at 323 (explaining that a parent's treatment of a nonrelative child is probative of how they may treat their children). Additionally, the record suggests that father knew that CXA was dead and that mother placed his body in the basement freezer. Father not only failed to report the death to the police, but continued to leave ALT and LAT in mother's care. This gross neglect and negligence strongly supported the trial court's finding that there was a reasonable likelihood that the children would be harmed if returned to father's care. For the foregoing reasons, the trial court did not clearly err when it found termination was proper under MCL 712A.19b(3)(j).

Under MCL 712A.19b(3)(k)(*iii*), a court may terminate parental rights if it finds clear and convincing evidence that the parent battered or severely physically abused the child or a sibling, and "there is a reasonable likelihood that the child will be harmed if returned to the care of the parent." A respondent's abuse of a half-sibling is sufficient to satisfy the requirement in MCL 712A.19b(3)(k)(*iii*). CAS stated that father physically abused him, going so far as to break

his foot and cause him severe physical injury. CAS further stated that father battered CXA with multiple objects, including a belt. As discussed earlier, there was a reasonable likelihood that the children would be harmed if returned to father's care. Accordingly, the trial court did not clearly err by terminating his parental rights under MCL 712A.19b(3)(k)(*iii*).

## C. BEST INTERESTS

Finally, father argues that the trial court clearly erred by finding that termination was in the children's best interests. We again disagree.

This Court reviews a trial court's best-interests determination for clear error. *White*, 303 Mich App at 713. Clear error exists when the reviewing court has a definite and firm conviction that a mistake was made. *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020).

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018) (citation omitted). "Best interests are determined on the basis of the preponderance of the evidence." *Id*. (citation omitted). The trial court should consider all of the evidence when determining whether it is in the child's best interests to terminate parental rights. *White*, 303 Mich App at 713. Some of the specific factors that the trial court should consider include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. (citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714.

The trial court found that father did not have a significant bond with his children and failed to adequately participate in parenting time. Father only visited the children for 10 to 15 minutes a week prior to their removal, which the trial court found was insufficient to establish a strong bond. Father admitted that he only began having lengthier parenting time visits with ALT and LAT as a result of a trial court order. We acknowledge that there was minimal evidence of a bond between LRT and father because LRT stated that she would like to visit father. However, nothing in the record indicates that father had a strong bond with any of the children. Additionally, father admitted that he did not pay child support for any of his children. He never found suitable housing and failed to provide proof that he was employed.

Poor parenting skills weigh in favor of terminating a respondent's parental rights. *Id*. Father showed his poor parenting skills by leaving ALT and LAT with mother when he knew she had significant untreated mental health issues, that she physically abused the children, and that she had caused the death of one of their siblings. Father's relationship with mother was tumultuous, and the record indicates that he was abusive toward her. Mother's mental health issues were so extreme that father moved out of her house. He declined to take ALT and LAT with him, and generally failed to make any effort to protect ALT and LAT from mother even after CXA's death at mother's hands. Father's refusal to assume any responsibility for CXA's death, despite knowing that mother was mentally unstable and had a history of abuse, reflected poorly on his fitness as a parent. Father's inability to care for ALT and LAT himself was not a justifiable reason for him to

leave them with a mentally unstable and dangerous parent. His decision to leave ALT and LAT with mother put them in danger and led to severe emotional harm.

The children's foster care worker opined that termination of father's parental rights would give the children stability and permanency, which is also relevant to a best-interests analysis. *Id*. LRT was in a long-term placement with her biological mother, and the children's paternal grandmother was willing to provide long-term care for ALT and LAT. Though the placement of ALT and LAT with a relative weighed against termination, in light of the foregoing evidence, the trial court did not clearly err by finding that termination was in ALT's and LAT's best interests. Likewise, although LRT was also placed with a relative and was not left in mother's (AMF) care or exposed to the same trauma that ALT and LAT were exposed to, "[h]ow a parent treats one child is certainly probative of how that parent may treat other children." *In re AH*, 245 Mich App 77, 89; 627 NW2d 33 (2001), quoting *In re LaFlure*, 48 Mich App 377, 392; 210 NW2d 482 (1973). Accordingly, the trial court did not abuse its discretion by finding that termination of father's parental rights to LRT was in her best interests.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Michael J. Kelly
/s/ Michelle M. Rick